John R. **STEENHOVEN,**
**Defendant-Appellant,**

v.

The **COLLEGE LIFE INSURANCE COMPANY OF AMERICA,**
**Plaintiff-Appellee.**

No. 2–783A254.

Court of Appeals of Indiana,
Second District.

Jan. 16, 1984.

662

Stephen A. Harlow, Maribelle G. Harlow, Harlow, Wright & Englert, P.C., Indianapolis, for defendant-appellant.

Terrill D. Albright, James. H. Ham, III, Paula F. Cardoza, Baker & Daniels, Indianapolis, Joseph T. Bumbleburg, Ball, Eggleston, Bumbleburg & McBride, Lafayette, for plaintiff-appellee.

RATLIFF, Judge, writing by designation

## STATEMENT OF THE CASE

Appellant John R. Steenhoven appeals from the Tippecanoe Superior Court's grant of a preliminary injunction in favor of appellee College Life Insurance Company of America (College Life). We affirm in part and reverse in part.

## FACTS

Appellant Steenhoven began to work for College Life in August 1967 pursuant to a "SPECIAL AGENT'S CONTRACT." He worked for College Life as an independent contractor until October 31, 1982, when his contract terminated. Some time prior thereto, Steenhoven approached Minnesota Mutual Life Insurance Company (Minnesota Mutual) about employment. Steenhoven proposed the replacement of approximately one-third (⅓) of his College Life business with more favorable Minnesota Mutual policies. Steenhoven was to receive a special commission arrangement from Minnesota Mutual, in excess of his arrangement with College Life, for converting the block of

policies. In early 1983 Steenhoven began to convert the policies of his targeted clients in wholesale fashion. This was substantially completed in just a few months. In the process of converting the policies, Steenhoven failed to return certain property of College Life subsequent to his termination. College Life brought an action alleging breach of Steenhoven's agent's contract, misappropriation of trade secrets, conversion, unfair competition, and wrongful interference with policyholder relationships. Upon College Life's motion the lower court granted a preliminary injunction enjoining Steenhoven from contacting College Life policyholders and inducing them to terminate or replace their policies and from using College Life's property which Steenhoven had in his possession. It is from this order that Steenhoven now appeals.

### ISSUE

Steenhoven presents a number of interrelated issues on appeal. However, these may be combined into one all-encompassing issue:

Did the lower court abuse its discretion in granting College Life's request for a preliminary injunction?

### DISCUSSION AND DECISION

■ We initially note that the grant or denial of a preliminary injunction rests within the sound equitable discretion of the trial court. *Wells v. Auberry*, (1982) Ind. App., 429 N.E.2d 679, 682; *Captain & Co., Inc. v. Towne*, (1980) Ind.App., 404 1159, 1161; *Negley v. Lebanon Community School Corp.*, (1977) 173 Ind.App. 17, 20, 362 N.E.2d 178, 180, *trans. denied.* This court will not interfere with the exercise of that discretion unless it is shown that the trial court's action was arbitrary or constituted a clear abuse of discretion. *Rees v. Panhandle Eastern Pipe Line Co.*, (1978) 176 Ind.App. 597, 604, 377 N.E.2d 640, 645; *Negley*, 173 Ind.App. at 20–21, 362 N.E.2d at 180. The discretion to grant or deny preliminary injunctive relief is measured by several factors, including whether the plaintiff's remedies at law are inadequate [1] thus causing irreparable harm pending resolution of the substantive action if the injunction does not issue,[2] whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a *prima facie* case,[3] whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction would occasion upon the defendant,[4] and whether by the grant of a preliminary injunction the public interest would be disserved. *Indiana State Department of Welfare, Medicaid Division v. Stagner*, (1980) Ind.App., 410 N.E.2d 1348, 1353. In determining whether an abuse of discretion exists in the grant or denial of a preliminary injunction, this court is necessarily involved with a review of the trial court's

1. *See City of Muncie v. Pizza Hut of Muncie, Inc.*, (1976) 171 Ind.App. 397, 357 N.E.2d 735 (equitable relief of injunction will not issue where there exists adequate legal remedy). *Cf. Unishops, Inc. v. May's Family Centers, Inc.*, (1980) Ind.App., 399 N.E.2d 760, *trans. denied* (in order to be adequate legal remedy must be as practical, efficient, and adequate as that afforded by equity).

2. *See Mid-America Marketing, Inc. v. Falender Development Corp.*, (1980) Ind.App., 406 N.E.2d 372 (plaintiff must demonstrate that he will suffer injury which is certain and irreparable if application is denied). *But see Rees v. Panhandle Eastern Pipe Line Co.*, (1978) 176 Ind.App. 597, 377 N.E.2d 640 (when acts sought to be enjoined are unlawful or clearly against public interest, plaintiff need show neither irreparable

harm nor balance of hardship in his favor). *Cf. Wells v. Auberry*, (1982) Ind.App., 429 N.E.2d 679 (only harm which court cannot remedy following final determination on merits may be deemed to constitute irreparable injury warranting issuance of preliminary injunction).

3. *See Wells v. Auberry*, (1982) Ind.App., 429 N.E.2d 679 (where potential for irreparable harm is great there is less need to go beyond establishment of a *prima facie* case on the merits, while as imminence of irreparable harm is reduced *prima facie* case requirement expands to test of probability of recovery on merits).

4. *See Mid-America Marketing, Inc. v. Falender Development Corp.*, (1980) Ind.App., 406 N.E.2d 372; *Rees v. Panhandle Eastern Pipe Line Co.*, (1978) 176 Ind.App. 597, 377 N.E.2d 640.

findings of fact.[5] Whether such findings of fact are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment and whether they are supported by evidence of probative value. *In re Marriage of Miles*, (1977) 173 Ind.App. 5, 8, 362 N.E.2d 171, 174, *trans. denied.* Such findings may not be set aside unless they are clearly erroneous.[6] *Negley*, 173 Ind.App. at 21, 362 N.E.2d at 180. If the findings are clearly erroneous, we must conclude that the lower court abused its discretion in granting the preliminary injunction. *Id.*

■ The trial court found, in part, that, upon his termination, Steenhoven was contractually required to return to College Life certain materials it had provided him at the commencement of his employment and periodically thereafter.[7] The court then enjoined Steenhoven's use of the disputed materials. College Life contends that the lower court correctly enjoined Steenhoven due to his improper use of College Life's property subsequent to his termination. Steenhoven argues that he was not prohibited from using such materials and, in any event, had returned the disputed materials so that the part of the preliminary injunction enjoining his use of such materials was an abuse of discretion. We find ourselves in agreement with College Life's position.

Paragraph twenty-six (26) of Steenhoven's contract states, in pertinent part, that "[u]pon termination hereof AGENT ... shall immediately deliver to COMPANY, at its expense, all rate books, manuals, records, supplies, and miscellaneous materials *furnished AGENT by COMPANY,* all of which have remained the property of COMPANY." Record at 20 (Emphasis supplied). Steenhoven does not attack the validity of the contract. Rather, since the court's finding that the materials were the property of College Life [8] is adequately supported by the record, we cannot say that the finding is clearly erroneous. Further, as there is no showing on the record that the materials have been returned,[9] we cannot say that the court abused its discretion in enjoining Steenhoven from using the materials furnished him by the company.

We note, however, that the lower court's injunction went beyond merely enjoining Steenhoven's use of materials furnished him by the company, and included certain information acquired by Steenhoven during his employment.[10] Steenhoven argues that such information is not contemplated by the contract and, therefore, could not be the proper subject of the court's injunction. College Life contends that such information is clearly protectible under the contract and, in any event, its use violates the provisions of the Uniform Trade Secrets Act, so as to justify the court's grant of the preliminary injunction.[11] In this respect,

---

5. Indiana Rules of Civil Procedure, Trial Rule 52(A)(1) requires the court to make special findings of fact without request when granting or denying a preliminary injunction.

6. *See* Indiana Rules of Civil Procedure, Trial Rule 52(A).

7. The lower court found that "[u]pon termination of Steenhoven's contract with College Life, Steenhoven was required to deliver to College Life all rate books, manuals, records, supplies, and miscelleanous [sic] materials which were the property of College Life." Record at 240.

8. *See* note 7 *supra.*

9. A self-serving statement in a brief in opposition to the motion for preliminary injunction is insufficient to demonstrate on the record that the materials in question had been returned.

10. The lower court found:
    "(5) The materials and information that Steenhoven was required to deliver to College Life would include policy holder lists, rate books, rate cards, applications, policy owner service cards, names and addresses of policy owners and insureds, policy numbers, surrender or loan values, renewal options, and anniversary, maturity, and expiry dates."
    Record at 240–41.

11. The court's finding of fact numbered sixteen (16) stated:
    "For the most part, the information used by Steenhoven, to make his analysis of College Life policies, was information that Steenhoven should have returned to College Life upon the termination of his agent's contract, and such information was not generally known or readily ascertainable by other person or persons."
    Record at 242.

we are constrained to agree with Steenhoven's position.

■ Paragraph twenty-six (26) of the special agent's contract is the only applicable portion of the contract to specifically address the return of the company's property upon the agent's termination.[12] Contrary to appellee's assertion, paragraph twenty-six (26) is anything but clear in its import. It speaks only to "books, manuals, records, supplies, and miscellaneous materials furnished AGENT by COMPANY...." Record at 20. The contract does not allude to information gleaned by the employee from his employment. Because we necessarily must strictly construe the provisions of the contract against College Life, *English Coal Co., Inc. v. Durcholz,* (1981) Ind.App., 422 N.E.2d 302, 309, *trans. denied,* we must conclude that the contract does not prohibit Steenhoven's use of the information he acquired during his employment with College Life.

■ College Life further asserts, however, that the information utilized by Steenhoven in replacing the policies falls within the ambit of the Uniform Trade Secrets Act. Indiana Code section 24–2–3–2 (1982) (As added by Acts 1982, Pub.L. 148 § 1) states:

" 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, *and not being readily ascertainable by proper means* by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. [Emphasis supplied.]"

We believe the emphasized language is dispositive of the issue. While testimony at the hearing indicated that the information utilized by Steenhoven was indeed available from rate books, rate and policyowner cards, and company print-outs supplied to Steenhoven by the company, uncontradicted evidence indicated that the information was also available from the policyholder himself—from the actual policy and information given·the policyholder by the company through its agent. Because it is uncontroverted [13] that the information was readily obtainable from the policyholder,[14] the court's finding to the contrary is clearly erroneous,[15] and cannot support the court's

12. Paragraph fourteen (14) of the agent's contract states:

"AGENT, at the sole and substantial expense to COMPANY, is schooled in and taught and receives information concerning sales methods, procedures, techniques and materials in connection therewith used by COMPANY and agrees that all thereof is confidential and declared trade secrets.

AGENT SHALL NOT, during the life of this CONTRACT, and for a period of three years after termination hereof, regardless of whether this CONTRACT is terminated for cause or otherwise, divulge to any person not connected with COMPANY (except when making a sales presentation as AGENT for COMPANY), any information concerning sales methods, procedures, techniques, or any and all materials in connection therewith, used by COMPANY."

Record at 18. Although paragraph fourteen also deals with company materials and property, College Life concedes that "Section 14 of the contract is meant to protect the 'package sale' presentation to the student market that Steenhoven and other new agents learned when they began their careers with College Life." Appellee's Brief at 39. As the package sale presentation was not alleged to have been divulged, we can only conclude that paragraph fourteen is inapplicable in the instant action.

13. The lower court cannot ignore competent, uncontradicted evidence. *Accord Nordhoff v. Review Board of the Indiana Employment Security Division,* (1959) 129 Ind.App. 378, 383, 156 N.E.2d 787, 789.

14. College Life concedes as much when it notes that "as a practical matter it would be difficult to determine whether the information Steenhoven used in any particular policy replacement came from College Life's materials or from an independent source." Appellee's Brief at 43.

15. *See* note 11 *supra.*

order enjoining Steenhoven from using such information. Such a determination precludes the appellee's argument concerning the Uniform Trade Secrets Act. While the court quite properly precluded Steenhoven from using materials furnished him by the company, the court improperly included within the scope of the injunction information Steenhoven gleaned from his employment which was readily available from another source—the policyholders themselves. Although our courts have previously noted that such information may well be protectible as trade secrets, *Seach v. Richards, Dieterle & Co.*, (1982) Ind.App., 439 N.E.2d 208, 213; *Captain & Co., Inc. v. Towne*, (1980) Ind.App., 404 N.E.2d 1159, 1162, we must conclude that neither basis advanced in support of the lower court's findings and order in this case is a sufficient basis upon which to predicate the grant of the preliminary injunction. Neither the special agent's contract nor the Uniform Trade Secrets Act preclude Steenhoven's use of the disputed information, especially in light of its ready availability. The trial court erred insofar as it found otherwise. Accordingly, we affirm that part of the court's preliminary injunction enjoining Steenhoven from using materials furnished him by College Life. However, we reverse that portion of the injunction which prohibits Steenhoven's use of policyholder information which he acquired while employed with College Life.[16]

Steenhoven also argues that the court improperly enjoined him from contacting his past and present clients who hold College Life policies and from inducing them to terminate or replace those policies.[17] Again, we find ourselves constrained to agree with appellant. While an application for preliminary injunction is addressed to the trial court's discretion, the power to issue such an injunction should be used sparingly and should not be granted except in rare instances in which the law and facts are clearly in the moving party's favor. *Wells v. Auberry*, (1982) Ind.App., 429 N.E.2d 679, 682. In the instant case, Steenhoven was neither contractually[18] nor statutorily bound to refrain from his replacement attempts. Absent such an enforceable restraint against such activity we cannot say that the law and facts were clearly in College Life's favor. Further, the lower court made no finding that College Life lacked an adequate remedy at law[19] or that College Life would suffer irreparable harm if the preliminary injunc-

16. We note peripherally that the replacement contract, which College Life sought to impress upon Steenhoven, expressly includes "policyowner lists" as "confidential information and the exclusive property of [the] Company...." Record at 674.

17. College Life contends, as it does throughout its brief that the injunction was based upon the court's finding that Steenhoven improperly used College Life's materials and information in replacing the policies. This is clearly an insufficient basis upon which to predicate the injunction against contacting or inducing clients because whether or not Steenhoven could use such materials and information is ultimately not dispositive of the issue of whether he could be prohibited from replacing the policies.

18. Paragraph twenty-two (22) of the agent's contract states, in pertinent part:
"If AGENT shall at anytime, either during the life of this CONTRACT or after the termination hereof, and so long as any compensation is or may become due to AGENT; (a) induce or endeavor to induce any policyhold-

er of COMPANY to discontinue the payment of premiums or to relinquish any policy ... then and in any and every such event any and all sums that AGENT might be or become entitled to and all rights and interests of AGENT under this and all Contracts with COMPANY or Supplements thereto, shall cease and terminate and COMPANY shall be relieved and released of any and all obligations to AGENT, anything in said Contracts and Supplements thereto to the contrary notwithstanding."
Record at 19. This paragraph merely states the company's remedy *if* the agent induces policy termination. It does not forbid such action on the agent's part. We also note that paragraph three (3), which states that the agent "shall not transact business with or for any other life insurance company ...", Record at 17, can only be construed as preventing such actions while agent is employed by College Life.

19. In fact, paragraph twenty-two (22) does provide a legal remedy for an agent's breach in the form of a forfeiture clause. *See* note 18 *supra*.

tion did not issue.[20] *Wells,* 429 N.E.2d at 683. We, therefore, conclude that the granting of that portion of the preliminary injunction which enjoins Steenhoven from contacting his past and present clients who hold College Life policies and from inducing them to terminate or replace those policies constituted an abuse of discretion and must be reversed.

■ Finally, appellee contends that Steenhoven's deceit would be a sufficient basis upon which to predicate the grant of the preliminary injunction. In replacing the College Life policies, Steenhoven's initial letter to the targeted clients indicated that he was still a broker for College Life. The lower court concluded that this was a misrepresentation because, while Steenhoven may have been a broker for College Life, he was no longer an agent, and that distinction would have little or no meaning to the policyholders with whom he dealt. However, we conclude that because Steenhoven could not be prohibited from replacing the policies, the fact that he may have done so in an allegedly deceitful manner is of no moment in enjoining him in the instant case.

Accordingly, we affirm that part of the preliminary injunction which enjoined Steenhoven from using the materials furnished him by College Life. In all other respects the court's grant of the preliminary injunction is reversed.

20. The court found that Steenhoven's replacements had "caused College Life to lose a substantial sum in premium revenue." Record at 241. However, merely economic injury will not warrant the granting of a preliminary injunction. *Wells v. Auberry,* (1982) Ind.App., 429 N.E.2d 679, 684. The court also concluded that "[i]n almost all cases where College Life policies were replaced ... [this] terminated any future relationship with College Life." Record at 243. While this court will look to the lower court's findings, conclusions, and order when reviewing the grant of a preliminary injunction, *Id.* at 682, where a conclusion which is factual in nature is not supported by evidence of probative value, we will not abide thereby. It is well settled that the party seeking an injunction has the burden of showing, by a preponderance of

Costs to be assessed as follows: One-Third payable by Appellant; two-thirds payable by Appellee.

SHIELDS and MILLER (by designation), JJ., concurs.

the evidence, that the facts and circumstances entitle him to an injunction. *See Kramer v. Rager,* (1982) Ind.App., 441 N.E.2d 700, 705; *State ex rel. Department of Natural Resources v. Mason,* (1981) Ind.App., 416 N.E.2d 1312, 1316 n. 3, *trans. denied.* It has also previously been noted that one element of a *prima facie* case for preliminary injunctive relief is a showing of irreparable harm. *Rees v. Panhandle Eastern Pipe Line Co.,* (1978) 176 Ind.App. 597, 607, 377 N.E.2d 640, 647. In the instant case, College Life never demonstrated that it was in any way precluded from approaching or "prospecting" its former clients with the intent of replacing their Minnesota Mutual policies with more favorable College Life policies. Thus we cannot say that irreparable harm was demonstrated on the record.